Osborne, J.
On October 28, 1872, an assessment was confirmed by the common council on map N, sub-division 2 of district No. 29 and part of subdivision No. 1, for what is commonly known as the Third avenue sewer, including the lateral sewers. Plaintiff owned certain lots in said district, on which he paid for his proportion of said assessment, the sum of $983.10.
Plaintiff claims that this assessment, while regular on its face, was invalid in part on the ground that the cost of the work was fraudulently increased and made excessive by collusion, and he brings this action to declare said assessment invalid to the extent of such excessive charges, and to recover back so much of the amount paid by him as was in excess of what his assessment ought fairly to have been.
Defendant’s answer is a general denial and also sets up the defense of the Statute of Limitations.
The issues were referred to John D. Pray, Esq., to hear and determine and he has reported in favor of the plaintiff, reducing his assessment sixteen and one-third per cent. From the judgment entered on the referee’s report defendant appeals.
We shall only advert to the more salient facts in the case as found by the referee to explain the conclusions at which we have arrived.
In May, 1869, the water and sewerage board advertised for proposals for building the main sewer called the Third avenue sewer. In July, 1869, ten bids were received for such work which ranged in amount from $186,027.25 up to $231,169, which latter amount was the bid of W. 0. Kingsley.
*702 On July 12, 1869, the contract was awarded to J. C. Van Winkle, the lowest bidder, for the sum of $186,027.26; by his contract it was provided that the sewer should be completed during the working season of 1870, and it was also further provided that if at any time the engineer of the board should be of the opinion that the work was unnecessarily delayed and would not be finished in the prescribed time, he should notify the contractor to that effect, and if the contractor did not, within five days, take such measures as would, in the judgment of the engineer, insure the satisfactory completion of the work, then the engineer might, with the consent of the commissioners, cancel the contract, and the engineer should then have power, under the direction of the commissioners to finish the work by contract or otherwise and to charge the expense thereof to the contractor.
Good and sufficient sureties to the contract were furnished by Van Winkle.
Van Winkle proceeded with the work under his contract, up to April 15, 1870, at which date he had completed about one-fourth of the work and had been paid on account of his contract, the sum of about $39,000 exclusive of lumber; on April fifteenth the engineer gave Van Winkle the five days notice provided for by the contract, as above stated, on the ground that Van Winkle was unnecessarily delaying the work; on May sixteenth the engineer was authorized by the board to notify Van Winkle to stop work; on May eighteenth the engineer informed the board that he had notified Van Winkle to stop work; the board thereupon and at the same meeting, on the recommendation of its construction committee, and without inviting competition, directed a contract to be entered into with A. O. Keeney for the completion of the work at certain rates greatly in excess of what Van Winkle had contracted for, as shown by the following comparison:
For 84 in. sewer per foot, Van Winkle, $25.00, Keeney, $44. GO-
78 CC cc cc cc 22.00) 43.75
72 cc cc cc cc 22.00. 40.75
66 cc cc cc cc 19.00) cc 33.50
60 cc cc cc cc 16.00) cc 27.00
48 a cc cc cc 11.25) cc 18.25
36 cs cc cc cc 9.00) cc 15.00
30 cc cc cc cc Í.70, cc 13.00
24 cc cc cc cc 6.00) cc 9.00
15 cc cc cc cc 3.00) cc 5.00
The total amount that would have been payable to Van Winkle, if he had completed his contract at the prices *703 agreed upon by Mm, would have been about $186,000, out of which he testified he would have made a profit of twenty per cent.
Van Winkle, at the time the contract was taken from him, it will be remembered, had completed one-fourth of the work and had been paid about $39,000.
There was paid to Kenny, under his contract for the remaining three-fourths of the work, exclusive of lumber, the sum of about $298.000, being about $112,000 in excess of what Van Winkle would have received if he had completed his contract. No increase in the prices of labor or material is shown to account for tMs extraordinary and extravagant increase over the prices contracted to be paid Van Winkle.
On April 28, 1870, and less than one month before the contract was awarded to Keeney, eleven bids were received for the construction of the lateral sewers, the cost of which formed a part of the assessment complained of, and the contract was awarded to Edward Freel as the lowest bidder.
Some of the prices at which the contract was awarded to Freel, as compared with the prices agreed to be paid Keeney on the main sewer contract, are as follows:
For 38 in. sewer per foot, Keeney, $15.00, Freel, $4.75
30 “ “ “ “ “ 13.00, “ 4.20
24 “ “ “ “ “ 9.00, “ 4.00
15 “ “ “ “ “ 5.00, “ 2.03
The total cost of the main sewer, as fixed by the city, was $485,901.16, in which is included the enormous sum of $129,134.55 alleged to have been paid .for engineering, inspection, maps, etc.
The only pretext or excuse set up by the city for the payment of these large prices to Keeney is that it was necessary to hasten the work, which it is alleged had been delayed by Van Winkle, and that consequently it was proper to pay the increased prices in consideration of an early completion of the contract; but the record does not support the pretext. Van Winkle received his contract on July 21, 1869, and was to complete it during the working season of 1870. Keeney got his contract for the remaimng three-fourths of the work on May 19, 1870, and was to complete it during the working season of 1871; true, Keeney did complete his contract during 1870, but he was not compelled so to do.
While it is true that fraud is not to be presumed, yet where the facts are such that they naturally and logically *704 indicate its existence, and are not consistent with an innocent intent, fraud is established.
We are unable to see that the facts above stated, taken as they are taken from the record, constitute a mere error of judgment. As was said in the Matter of the Lake and Watts’ Orphan Home (92 N. Y., 121), “If the difference in the prices had been such only as could be fairly accounted for upon the theory that the work had been merely improvidently or perhaps extravagantly done, a case would not have been made for the interference of the court. But here there was more, and the facts lead irresistibly to the conclusion that there was either fraud pr some unexplained irregularity.
The sureties on Van Winkle’s contract were men of responsibility, and it is a further significant fact that no proceedings have ever been commenced against them to recover any of the damage.alleged to have been sustained by the city by reason of Van Winkle’s alleged default.
Nor in our opinion does the amendment of June 1, 1874, to the city charter constitute a defense to this action. By this amendment, it is provided that “All assessments heretofore made in said city for any local improvement are hereby confirmed, and the amount of the same is hereby levied as a tax on the several pieces or parcels of land on which the same has been heretofore assessed and apportioned.”
The power of the legislature to impose taxation, either general or special, is too well settled to afford room for question, but no case that has been called to our attention goes so far as to hold that the legislature can validate an assessment void or voidable for fraud; on the contrary, so far as can be gathered from the opinions of the court of appeals, rendered in cases involving acts of a similar character, an assessment void or voidable for fraud is not affected by those acts.
In the Matter of Van Antwerp (56 N.Y., 261), which was an act to reduce certain assessments, the legality of which was denied, and to levy two-thirds of the cost thereof as a tax, the court say (p. 265):
“It is objected that it is not competent for the legislature to validate a void assessment, and that it could only authorize a re-assessment. The answer to this is that the legislature did not attempt to legalize the old assessments, but itself exercised the power of making new assessments. The old assessments are referred to, not for the purpose of adoption, but for the purpose of fixing the specific amount by the proportion specified. The act in question does not interfere with any vested right or cause of action of the petitioner to set aside the original assessment ”
*705 So in Brown v. The Mayor, etc., of New York (63 N. Y., 239), which involved the power of the legislature to ratify a contract of the city which was ultra vires, the validity of the act was recognized, but stress was laid upon the fact that the good faith of the contract was not questioned.
In The People ex rel. Hays v. The City of Brooklyn (71 N. Y., 495), this amendatory act was in question, and it was expressly held that it did not embrace invalid assessments laid without authority or jurisdiction, the court there say: “ It (the act of 1874) evidently, we think, was designed to cover cases only where lawful assessments had already been made or proceedings were in progress in regard to the same. It clearly did not include invalid, unlawful assessments, laid without any jurisdiction and which could not be enforced according to law.
It being our opinion that the assessment was fraudulently increased, as above stated, it became thereby “ an unlawful assessment” and one “which could not be enforced according to law,” and so clearly within the ruling just quoted.
Nor do we think that the statute of limitations is a valid defense to this action. The plaintiff brings this action in equity to obtain relief on the ground of fraud, and prays judgment, “ declaring the assessment invalid to the extent of the alleged excessive charges, and reducing the same by deducting such amount and for the recovery of such amount, with interest.”
We are of the opinion that the cause of action comes within the six year limitation, or, as prescribed by subdivision 5 of section 382 of the Code of Civil Procedure, which provides that the cause of action is not to be deemed to have accrued until the discovery of the facts constituting the fraud.
We are referred by the learned counsel for the appellants to the cases of Brundage v. Village of Portchester (31 Hun, 129, affirmed 102 N. Y., 494; 2 N. Y. Stat. Rep., 398), and Parsons v. City of Rochester (5 N. Y. Stat. Rep., 467), as sustaining his contention.
Neither of those cases, however, are in point. In the Brundage Case the action was not in equity, but was brought for money had and received, and the court of appeals in their opinion affirming the judgment of the court below, say, that if the action had been brought to recover back the money paid upon an assessment apparently valid and.levied according to the forms of law, but rendered illegal by extrinsic facts of those which were not apparent upon the proceedings, it cannot be disputed, but that it would be necessary for the plaintiff to proceed in equity to *706 vacate such proceedings, before he could recover back moneys paid thereon.
In Parsons v. City of Rochester, the assessment which the plaintiff sought to recover had been declared void in another action (Hassan v. City of Rochester), for the reason that all the lands benefited by the improvement had not been assessed as required by the provisions of the city charter, after the determination of the Hassan suit, the plaintiff sued at law to recover back the amount of the assessment paid by him. He sought no relief in equity, alleged no fraud, and it was very properly held that the statute of limitations had run against him.
We are, therefore, of opinion that the judgment appealed from, should be affirmed.
Judgment affirmed, with costs.
Van Wyck, J., concurs.